## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALEXANDRIA LINDERS, individually, and on behalf of all others similarly situated, | ) ) ) | 3:25-CV-659 (SVN) |
| *Plaintiff*, | ) ) | |
| v. | ) ) | |
| | ) | March 6, 2026 |
| FESTIVAL FUN PARKS, LLC, | | |
| *Defendant*. | | |

### RULING AND ORDER
### <u>ON DEFENDANT'S MOTION TO DISMISS AND TO COMPEL ARBITRATION</u>

Sarala V. Nagala, United States District Judge.

Plaintiff Alexandria Linders brings this action on behalf of herself and all others similarly situated against Defendant Festival Fun Parks, LLC, alleging claims for a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq*. and unjust enrichment. Plaintiff alleges that Defendant's website for Lake Compounce—an amusement and water park located in Bristol, Connecticut—surprised customers with a non-advertised processing fee added at checkout, in violation of Connecticut law. *See* Conn. Gen. Stat. § 53-289b. Defendant has filed a motion to dismiss and to compel arbitration, arguing that customers who purchase tickets through the website consent to terms and conditions that require arbitration of their claims and waive their ability to bring a class action suit. For the reasons set forth below, the Court DENIES Defendant's motion to dismiss and to compel arbitration.

## I.    FACTUAL BACKGROUND

In deciding a motion to compel arbitration, the Court considers "all relevant, admissible evidence submitted by the parties." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019). Unless otherwise noted, the parties do not dispute the following facts for the purpose of this motion.

Defendant owns and operates both Lake Compounce and its website, lakecompounce.com (the "Website"). Compl., ECF No. 1 ¶ 9. In April of 2024, Plaintiff purchased "one 2024 Gold Season Pass" to Lake Compounce through Defendant's website. *Id.* ¶ 8. The complaint does not allege that Plaintiff had previously purchased any tickets or passes from the Website. Plaintiff alleges that "[t]he transaction flow process she viewed on Defendant's website was substantially similar to that as depicted" in the complaint and described below. *Id.* Defendant, for its part, has submitted its own set of images compiled from Lake Compounce's current website, which it represents contain "no changes . . . made to the layout, font sizes, or substantive content since April 30, 2024." Pfordresher Decl., ECF No. 20-2 ¶ 4; *Id.*, Ex. 1 at 2–9. The differences between the parties' submissions are discussed below.[1]

A. <u>The Purchasing Process</u>

The Website's ticket purchasing process involves a number of distinct steps. According to Plaintiff's complaint, upon opening the Website's homepage, the customer is greeted with a dark grey band running across the top of the screen, presenting the option to click on a number of drop-down menus, including one for "Tickets and Passes." ECF No.1 ¶ 10, Fig. 1.

---

[1] Following oral argument, on March 5, 2026, Defendant filed a motion—which Plaintiff opposes—for leave to file a supplemental declaration in support of its motion to dismiss and to compel arbitration, which includes as attachments additional screenshots of the Website dated from June 2025, alleged to "come from the same archive used to generate" the images Defendant originally submitted. Mot. to Supplement, ECF No. 47; Harkins Decl., ECF No. 47-1 ¶ 3. The Court denies the motion. First, Defendant had ample opportunity to supplement the record prior to oral argument on its motion, and the Court discouraged supplementation at the oral argument. The Court sees no reason to allow supplementation at this late stage. Second, the Court does not see the relevance of screenshots from June 2025 to the Website's layout in April of 2024, when Plaintiff used it to purchase her ticket. Accordingly, Defendant's motion is denied.



Clicking the link for "Tickets and Passes" takes the customer to a screen displaying ticket options for both individual tickets and group tickets. *Id.* ¶ 11. An adult "Single Day Ticket" is advertised at a price "as low as" $34.99 on this page. *Id.*, Fig. 2.



Figure 2

After clicking "Buy Now," the customer is taken to the first page in a five-step purchase process, where the customer may select the number of tickets they wish to purchase and add them

to their cart. *Id.* ¶ 12. The price of an individual adult ticket on this page is also advertised for as low as $34.99. *Id.* The layout across each of the five pages of the checkout process is substantially similar. Each page has a grey shaded vertical column to the right of the page with a white rectangle that includes the customer's "[o]rder summary," displaying the items in the customer's cart and price information. *Id.* This column is visually separated from the rest of the page. *Id.*, Fig. 3.



Figure 3

Defendant's set of website images begins at this screen and does not show the blue "Continue" button. *See* ECF No. 20-3 at 2.[2]

---

[2] The declaration attached to Defendant's motion for leave to supplement the record states that the declarant is "not certain" why the "Continue" button (and a "Back") button were not visible on the screenshots attached to the original Pfordresher declaration. *See* ECF No. 47-1, ¶ 5.



Instead, the continuation of Defendant's screenshot shows a separate, light blue shaded horizontal box that appears on the bottom left of the screen containing four hyperlinked terms, in dark-blue font color, one of which is labeled "Terms & Conditions," (the "Terms"). *Id.* at 3. The other hyperlinked terms are labeled "Privacy Policy," "Operating Rules," and "ADA Accessibility." *Id.* The box containing these hyperlinks is visually separated from the rest of the Website page, as depicted below.



ECF No. 20-3 at 3.

According to Plaintiff, clicking "Continue" would then take the user through two pages to select a date for the ticket, each of which displays a ticket price.  ECF No. 1 at 7, Figs. 4 & 5.

Defendant's images do not include date selection pages.  But the parties agree that the next page contains an option to "upgrade all passes."  In both Plaintiff's and Defendant's images, the Terms hyperlink appears directly below the horizontal rectangular box with the upgrade option, and a green rectangular box also appears within the grey shaded vertical column that calculates the "SUBTOTAL" and "TOTAL" purchase price for the transaction on the right side of the screen.  ECF No. 1 at 8, Fig. 6; ECF No. 20-3 at 4.[3]

---

[3] Defendant's images do not show a processing fee in the green box, as Plaintiff's images show.  *Compare* ECF No. 20-3 at 4, *with* ECF No. 1 at 8, Fig. 6.  This difference is immaterial for purposes of the Court's decision on the present motion, but is relevant to Plaintiff's underlying claim of an undisclosed fee, and casts doubt on Defendant's assertion that "no changes" have been made to the checkout process since April 30, 2024.  *See* ECF No. 20-2 ¶ 4.



Defendant's Image



Plaintiff's Image

At this point, Plaintiff's and Defendant's images begin to contain material differences.  To start, Defendant contends the next two screens, allowing the user to (1) add on "extras," such as beverage cups and parking and then (2) enter personal information such as name, email address,

and physical address, each present the blue rectangular box containing the Terms and other hyperlinks, while Plaintiff's images of these similar pages do not depict the blue box containing those hyperlinks.[4]



Plaintiff's Image, ECF No. 1 at 9, Fig. 7



Defendant's Image, ECF No. 20-3 at 5

---

[4] Defendant's supplemental declaration states that "[a] blue-shaded bar containing links labeled 'Privacy Policy,' 'Operating Rules,' 'Terms & Conditions,' and 'ADA Accessibility' appeared at the bottom of each screen of the checkout process except for the 'Payment Information' screen depicted on page 7 of Ex. 1 to the Pfordresher Declaration."  ECF No. 47-1 ¶ 4.  As discussed below, even if the Terms link appeared numerous times during the checkout process, it still did not put Plaintiff on inquiry notice of the agreement to arbitrate.





Plaintiff's Image, ECF No. 1 at 9, Fig. 8

Defendant's Images, ECF No. 20-3 at 6–7

Additionally, in Defendant's image, below the field for entering a zip code and above the blue box containing the Terms hyperlink, there are two check boxes.  ECF No 20-3 at 7.



"Park Rules" is highlighted in blue text and hyperlinked, and is associated with an asterisk that contains the following language:  "It is mandatory to accept these conditions to make the purchase."  *Id.*  Plaintiff's image does not depict these check boxes.

From there, the parties agree that the user is taken to a screen to input credit card information, which does not contain any relevant hyperlinks.  ECF No. 1 at 10, Fig. 9; ECF No. 20-3 at 8.  Defendant includes one final screenshot of a page from which tickets can be downloaded, which again contains the blue box containing the Terms hyperlink.



ECF No. 20-3 at 9.

B.  <u>The Terms and Conditions</u>

As noted above, the checkout process includes a hyperlink labeled "Terms & Conditions," with no further description or any statement as to whether review of the Terms is necessary before purchasing a ticket.  *See, e.g.*, ECF No.1 ¶ 15, Fig. 6; ECF No. 20-3 at 3–5, 7, 9.  Clicking on the hyperlink takes the customer to the actual Terms.  At the top of the Terms in all capital letters and bolded is the message:  "**IMPORTANT NOTICE:  THESE TERMS CONTAIN A BINDING ARBITRATION PROVISION AND CLASS ACTION WAIVER.  IT AFFECTS YOUR LEGAL RIGHTS AS DETAILED IN THE ARBITRATION AND CLASS AND CLASS ACTION WAIVER SECTION BELOW.  PLEASE READ CAREFULLY.**"  Terms, ECF No. 20-4 at 2.

Paragraph fourteen of the Terms contains the arbitration agreement and class action waiver provision at issue here.  First, the parties "shall use their best efforts to settle any dispute, claim,

question, or disagreement and engage in good faith negotiations which shall be a condition to either party initiating a lawsuit or arbitration." *Id.* at 15, § 14(a).  If the parties do not reach resolution through the informal process within thirty days, "either party may initiate binding arbitration as the sole means to resolve claims," subject to certain terms.  *Id.* § 14(b).  As relevant here, "all claims arising out of or relating to [the] Terms (including their formation, performance, and breach), the parties' relationship with each other . . . including [the customer's] purchase or use of [t]ickets, shall be finally settled by binding arbitration administered by JAMS." *Id.*  Additionally, "the arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of these Terms[.]" *Id.*

Section 14(d), in turn, contains a class action waiver agreement.  It provides that "any arbitration shall be conducted in [the parties'] individual capacities only and not as a class action or other representative action, and the parties expressly waive their right to file a class action or seek relief on a class basis." *Id.* at 17, § 14(d).  If section 14(d) "is found unenforceable, then the entire 'Binding Arbitration and Class Action Waiver' [section 14] will be null and void." *Id.*  Further, if there is "a final judicial determination that applicable law precludes enforcement of [paragraph 14(d)'s] limitations as to a particular remedy or form of relief . . . then that [remedy] (and only that [remedy]) must be severed from the arbitration." *Id.*  The terms and conditions were last updated on August 7, 2023, and thus were in full force and effect when Plaintiff purchased her pass in April of 2024.  ECF No. 20-4 at 2.

C.  Plaintiff's Claims

Plaintiff brings two claims:  violation of CUTPA, and unjust enrichment.  ECF No. 1 ¶¶ 27–45.  Plaintiff's CUTPA claim is premised on a violation of what Plaintiff calls Connecticut's "Ticket Scalping Law," Conn. Gen. Stat. § 53-289a(b), the most recent version of which came into

effect on October 1, 2023.  That law provides in relevant part that "[n]o person shall advertise the prices of tickets to any entertainment event, including, but not limited to, any place of amusement, . . . for which a service charge is imposed for the sale of a ticket at the site of the event, without conspicuously disclosing in such advertisement, whether displaced at the site of the event or elsewhere, the total price for each ticket and what portion of each ticket price, stated in a dollar amount, represents a service charge."  *Id.*

## II.    LEGAL STANDARD

Defendant moves to dismiss and to compel arbitration under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  *See Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49 n.6 (2d Cir. 2022) (recognizing that motions to dismiss and to compel arbitration may be brought under those two rules and under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*).  There is a "lack of clarity in the case law of this Circuit (and others) as to what procedural mechanism must be employed by courts to dismiss actions in which the parties are bound to resolve (or attempt resolution of) their claims in accordance with a contractual grievance procedure, such as an agreement to arbitrate."  *Tyler v. City of N.Y.*, No. 05-CV-3620 (SLT) (JO), 2006 WL 1329753, at *2 (E.D.N.Y. May 16, 2006) (collecting cases).  As the parties focus on the standard that applies to a motion to compel arbitration under the FAA, the Court does so as well.[5]

The FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution."  *Preston v. Ferrer*, 552 U.S. 346, 349 (2008).  Section 2 of the FAA provides in relevant part that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or

---

[5] At oral argument, Defendant clarified that it does not challenge Plaintiff's complaint on grounds that the Court lacks subject matter jurisdiction or that the complaint fails to state a claim for relief.  Rather, because of the unclear nature of which procedural mechanism applies to a motion to compel arbitration, it simply cited to both Rules 12(b)(1) and 12(b)(6).

transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA in turn enables any "party aggrieved" by the failure of another to arbitrate under a written agreement for arbitration to petition a United States District Court "for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* § 4.

The Second Circuit has developed a two-part test to determine whether claims are subject to arbitration, considering "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). The party seeking to compel arbitration "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit* Union, 49 F.4th 95, 101–02 (2d Cir. 2022). "[A]greement formation questions" are determined "by applying the law of the state at issue[.]" *Barrows*, 36 F.4th at 50. "A court may not deny arbitration where there is a valid arbitration agreement that covers the asserted claims." *Davis v. Macy's Retail Holdings, Inc.*, No. 3:17-CV-1807 (JBA), 2018 WL 4516668, at *2 (D. Conn. Sept. 19, 2018) (citation omitted).

In the context of a motion to compel arbitration brought under the FAA, courts apply "a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).[6] The party seeking to compel arbitration must "substantiat[e] [its] entitlement [to arbitration] by a showing of evidentiary facts" that support its claim that the

---

[6] The Court notes that Rule 12(b)(6) likely should not apply to consideration of a motion to compel arbitration, given that the Second Circuit has endorsed "a standard similar to that applicable for a motion for summary judgment" for such motions. *Bensadoun*, 316 F.3d at 175. Rule 12(b)(6) explicitly eschews a summary judgment standard and consideration of matters outside the pleadings. If a court wishes to consider matters outside the pleadings, the 12(b)(6) "motion must be treated as one for summary judgment under Rule 56," and the Court must provide a "reasonable opportunity" for all parties to present evidence upon conversion. *See* Fed. R. Civ. P. 12(d). Thus, Rule 12(b)(6) is not the appropriate legal standard for issues that require a level of review akin to a summary judgment standard.

other party agreed to arbitration.  *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).  "If the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," courts "may rule on the basis of that legal issue and avoid the need for further court proceedings."  *Zachman*, 49 F.4th 95, 101 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017)); *see also Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011).  Where "there is an issue of fact as to the making of the agreement for arbitration," however, "then . . . a trial is necessary." *Zachman*, 49 F.4th at 101; 9 U.S.C. § 4.

## III.    DISCUSSION

### A.    Choice of Law

As a threshold matter, the Court applies Connecticut law to determine whether a contract was formed between the parties.  While Defendant's briefing suggested that Pennsylvania law may apply, *see* Def.'s Memo. Of Law, ECF No. 20-1 at 11 n. 2, both parties agreed at oral argument that for purposes of ruling on Defendant's motion, the Court should apply Connecticut law. Further, as the Second Circuit has noted, "traditional contract formation law does not vary meaningfully from state to state."  *Edmundson v. Klarna*, 85 F.4th 695, 702–03 (2d Cir. 2023).

### B.    Validity of Arbitration Agreement

The Court holds that Plaintiff was not on inquiry notice of the Terms—including the agreement to arbitrate disputes—and she did not unambiguously manifest assent to arbitrate.  Thus, Defendant's motion to compel arbitration must be denied.

To form a contract under Connecticut law, there must be an offer and an acceptance of that offer.  *Auto Glass Exp., Inc. v. Hanover Ins. Co.*, 293 Conn. 218, 227 (2009); *Ubysz v. DiPietro*, 185 Conn. 47, 51 (1981) ("[I]n order to form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the exchange between two or more parties.").  "[F]or

an enforceable contract to exist, the court must find that the parties' minds had truly met." *Fortier v. Newington Grp., Inc.*, 30 Conn. App. 505, 510 (1993), *cert. denied*, 225 Conn. 922 (1993).

The Second Circuit has "recognized that an offeree's manifestation of assent to an offeror's terms looks different for consumer contracts formed online, in which terms are usually unnegotiated and consumers often proceed without reading the fine print." *Edmundson*, 85 F.4th at 703. At issue here is what the Second Circuit has termed a "browsewrap" agreement, "which generally post[s] terms and conditions on a website via a hyperlink at the bottom of the screen." *Meyer*, 868 F.3d at 75.

When dealing with web-based agreements such as browsewrap, courts in this Circuit employ a two part test: "where there is no evidence that an internet or app user had actual knowledge of the contractual terms, the user will still be bound if (1) a reasonably prudent person would be on inquiry notice of the terms, and (2) the user unambiguously manifests assent through conduct that a reasonable person would understand to constitute assent." *Edmundson*, 85 F.4th at 703 (cleaned up). A "reasonably prudent" user is neither "a user who has never before encountered a smartphone app or entered into an online contract" nor "someone who spends all waking hours using some kind of technology"; rather, the "reasonably prudent" user is someone who "is not a complete stranger to computers or smartphones, having some familiarity with how to navigate to a website or download an app." *Id.* at 704 (cleaned up) (citing *Meyer*, 868 F.3d at 77–78). For instance, a reasonably prudent user "knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." *Meyer*, 868 F.3d at 77–78.

### 1. Inquiry Notice

First, there is no evidence that Plaintiff had actual knowledge of the Terms and the agreement to arbitrate. Thus, the Court examines whether Plaintiff had *inquiry* notice.

*Edmundson*, 85 F.4th at 703.  Here, Defendant has failed to establish that Plaintiff had inquiry notice as to the Terms, including the arbitration agreement.

The chief consideration for courts in determining inquiry notice is the "clarity and conspicuousness of the arbitration terms."  *Meyer*, 868 F.3d at 75 (cleaned up) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002)).  To determine the clarity and conspicuousness of arbitration terms, courts should consider how crowded a specific webpage is with extraneous information.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016) ("when terms are linked in obscure sections of a webpage that users are unlikely to see, courts will refuse to find constructive notice").  "By contrast, when terms are linked on an 'uncluttered' interface and temporally and 'spatially coupled with the mechanism for manifesting assent,' and the user does not need to scroll beyond what is immediately visible to find the terms," courts can conclude, "as a matter of law, that the interface provided reasonably conspicuous notice of the existence of contractual terms."  *Edmundson*, 85 F.4th at 704 (quoting *Meyer*, 868 F.3d at 78–79).  The Court also examines whether the terms and conditions were set off by different fonts, colors, bolding, or other distinctive characteristics that would likely draw a reasonable user's attention.  *Starke*, 913 F.3d at 290–91; *Edmundson*, 85 F.4th at 706.  Further, conspicuous language such as "I agree to the payment terms" can be evidence of sufficient inquiry notice, "while vague references to 'terms and conditions'" have been "deemed to undermine the conspicuousness of notice."  *Edmundson*, 85 F.4th at 707 (citing *Meyer*, 868 F.3d at 78; *Soliman v. Subway Franchisee Adv. Fund Trust, Ltd.*, 999 F.3d 828, 832 (2d Cir. 2021); *Starke*, 913 F.3d at 294).  The Court should also examine whether the "mechanism for manifesting assent" is temporally and spatially coupled to the customer's use of the website or app's features.  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 129 n.18 (2d Cir. 2012).  In conducting this analysis, the Court notes that one district

court in this Circuit recently examined the Terms on Defendant's Website and concluded a reasonable consumer was not on inquiry notice of the arbitration agreement contained therein. *Rodriguez v. Festival Fun Parks, LLC*, 763 F. Supp. 3d 336, 353–55 (E.D.N.Y. 2025).

### a.  The Parties' Different Images of the Website

First, the Court must determine which set of images of the Website—Plaintiff's or Defendant's—it should rely on for purposes of deciding Defendant's motion.  It concludes it can rely primarily on Defendant's images, supplemented by Plaintiff's.

As noted above, there are several differences between these two sets of images.  Most importantly, Defendant contends that the Terms hyperlink is available on "5 of the 6 screens" of the checkout process.  ECF No. 20-2 ¶ 11.  The images contained in Plaintiff's complaint, by contrast, show the Terms hyperlink appearing only in one image, corresponding to the "date" page. ECF No. 1 ¶ 14, Fig. 5.[7]  Defendant's images display a four-step process for purchasing a "summer splash sale" promotion item while Plaintiff's images display a five-step checkout process for a single ticket.  *Compare* ECF No. 1 at 4–10 *with* ECF No. 20-3 at 2–9.  Further, none of Defendant's images display the "continue" button used to advance to the next page of the checkout process, and where that button is relative to the Terms hyperlink at each stage of the payment process. Defendant's images also do not show a processing fee at any point in the checkout process. Finally, Defendant's screenshot of the "payment" page contains additional hyperlinked "Park Rules" that Plaintiff's image does not reflect.  *See* ECF No. 20-3 at 7.  At oral argument, the parties

---

[7] At oral argument, Plaintiff's counsel explained that its screenshots of the Website did not display the Terms hyperlink on each page in an attempt to show what a typical customer would see using a horizontally oriented monitor, rather than a vertically oriented one.  Plaintiff's counsel speculated that Defendant had used a vertically oriented screen in taking its screenshots and that is the reason why Defendant's images displayed the Terms in each screenshot.  This theory is well beyond the pleadings, however, and thus is not considered in the Court's analysis.

recognized the differences in their respective sets of images but stated that they did not contest the accuracy of either set of images.[8]

Each party expressed a preference to rely on its own set of images, with Plaintiff specifically contending that her set of images was the only set of images that showed the payment processing fee that is central to her claim.  But because the parties do not contest the accuracy of either set of images, the Court does not perceive a need to pick one set or another.  Rather, the Court will rely largely on Defendant's set of images for purposes of evaluating the present motion, as Defendant bears the burden to establish that an agreement to arbitrate existed.  *See Zachman*, 49 F.4th 95 at 101–02.  Where Defendant's images lack the information necessary for the Court's analysis, the Court will supplement its analysis with Plaintiff's images.

### b.  Clarity and Conspicuousness

The Court begins with the clarity and conspicuousness of the payment process pages.  Unlike in *Rodriguez*, the record here reflects no less than nine pages of images from the Website.  *See* ECF No. 1 at 4–10, ECF No. 20-3 at 2–9.  To begin, the Court looks to the most cluttered of these pages—the "extras" page—and finds that it is nevertheless sufficiently clear and conspicuous under Second Circuit precedent.  All of the less cluttered pages are similarly clear and conspicuous.  But, contrary to Defendant's position, the Terms are not sufficiently conspicuous on any of the Website pages to place Plaintiff on inquiry notice of the agreement to arbitrate.

First, the Court concludes that the "extras" page is uncluttered.  Defendant's version of the "extras" page includes four options of various extras that a customer may purchase along with her ticket, such as various drink options, a meal voucher option, and a parking pass.  ECF No. 20-3 at

---

[8] Where "there is an issue of fact as to the making of the agreement for arbitration . . . then a trial is necessary." *Zachman,* 49 F.4th at 101; 9 U.S.C. § 4.  However, because the parties agree to the accuracy of each set of images, the Court does not perceive an issue of fact requiring trial or further supplementation of the record.

5. Each option includes a multi-colored image accompanying the text for the add-on and is listed vertically directly above the Terms link, but outside of the shaded light-blue box where that link is located. *Id.* The majority of the page is white and grey, and the text for each extra is black, with a blue hyperlink below the title of each extra to "[s]ee more details." *Id.* The rectangular blue box containing the hyperlinked Terms appears at the bottom of the page in uncluttered fashion. Unlike in cases like *Nicosia*, the "extras" page—even with its multiple colored images, selection options, and page sections—is not so cluttered so as to obscure the Terms hyperlink. *See Nicosia*, 834 F.3d at 237 (finding "between fifteen and twenty-five links" in "at least four font sizes and six colors . . . alongside multiple buttons and promotional advertisements" to be distracting); *Rodriguez*, 763 F. Supp. 3d at 354.

However, the Second Circuit has indicated that clarity also involves an analysis of the conspicuousness of the Terms, and "when terms are linked in obscure sections of a webpage that users are unlikely to see, courts will refuse to find constructive notice." *Nicosia*, 834 F.3d at 233 (collecting cases); *see also Specht*, 306 F.3d at 23. In comparing Plaintiff's image of the "extras" page to Defendant's image of the same page, it is reasonable to infer that on certain pages the Terms "would have become visible . . . only if [customers] had scrolled down to the next screen." *Specht*, 306 F.3d at 23. For example, comparing the extras page at Figure 7 in Plaintiff's complaint to Defendant's corresponding image of the extras page, it appears that the "continue" button can be selected in Plaintiff's image without the customer ever seeing the Terms hyperlink that is located at the very bottom of the page in Defendant's corresponding image. *Compare* ECF No. 1 at 9 *with* ECF No. 20-3 at 5. While the Court recognizes that these sets of images correspond with two different types of purchases (a Summer Splash sale ticket and a Single Day Adult ticket), neither party has asserted that the images are inaccurate. On a motion to compel arbitration, the

Court must draw all reasonable inferences in favor of the non-moving party, *see Starke*, 913 F.3d at 281 n.1, and thus finds that at least on the "extras" page, the customer could have clicked continue without seeing the Terms or would otherwise have been required to scroll down to view the Terms.[9]

But even if—as Defendant now contends, *see* ECF No. 47-1 ¶ 4—the blue box containing the Terms link would have appeared at the bottom of each screen of the checkout process, it still is not sufficiently conspicuous. It appears third in a list of four hyperlinked terms (preceded by "Privacy Policy" and "Operating Rules" and before "ADA Accessibility"), and no specific attention is drawn to it to distinguish it from those other hyperlinks. And in any event, the Court finds that the website did not put Plaintiff on inquiry notice for two additional reasons: the Terms hyperlink is unaccompanied by additional text and is visually separated from the buttons the customer would need to click to advance through the purchase process.

First, the Terms hyperlink "is not accompanied by any other language that would indicate that, by proceeding with the transaction, the user is agreeing to the hyperlinked contractual terms." *Rodriguez*, 763 F. Supp. 3d at 354 (citing *Starke*, 913 F.3d at 293). No matter which page of the purchase process the customer was on, the Terms were always presented in the same way: highlighted blue text in a light-blue shaded box with no further descriptive text surrounding it. At no point during the checkout process is the customer presented with "warning" language explicitly stating that by purchasing a ticket she is agreeing to the linked Terms. *Edmundson*, 85 F.4th 695 at 707 (citing *Meyer*, 868 F.3d at 78).

---

[9] The same appears true of the ticket type page, *compare* ECF No. 20-3 at 2 *with* ECF No. 1 at 6 and the page to input personal information, *compare* ECF No. 1 at 9, Fig. 8 *with* ECF No. 20-3 at 6–7. But it does not appear that a user would have to scroll down to see the Terms on the upgrade page, *see* ECF No. 1 at 8 & ECF No. 20-3 at 4.

Defendant argues "[n]o reasonable consumer . . . would expect that they could purchase tickets . . . online with no applicable terms and conditions." ECF No. 20-1 at 12. True enough, but whether terms and conditions generally govern an online ticket sale is not the proper question; the proper question is whether Plaintiff had inquiry notice of the specific Terms governing her *particular* ticket purchase based on a review of the Website as a whole. Here, she did not.

Certain language in Defendant's image of the "payment" page buttresses that conclusion. That image includes a checkbox directly below where the customer inputs personal information that states "[p]lease visit Park Rules for details . . . *it is mandatory to accept these conditions to make the purchase." ECF No. 20-3 at 7. "Park Rules" is highlighted in blue text and hyperlinked. *Id.* A reasonably prudent user could easily be led to believe that the Park Rules, which the Website explicitly states the customer must accept in order to purchase a ticket, are the applicable terms for their purchase—rather than the Terms, which are in a separate, set-apart box at the bottom of the page with no such clarifying language and no checkbox format. *Cf. Meyer*, 868 F.3d at 78 (finding similar direction-containing language provided sufficiently conspicuous notice). The existence of competing hyperlinks, one of which contains an explicit directive that it must be accepted in order to complete a purchase, and another that simply says "Terms and Conditions," makes it confusing for a reasonable user to determine which set of terms governs the purchase of any ticket. This indicates a lack of inquiry notice of the Terms containing the arbitration agreement.

At oral argument, Defendant argued that the use of the word "conditions" in the asterisk line ("it is mandatory to accept these conditions to make the purchase") would have led a reasonable user to assume that *both* the Park Rules and the Terms were applicable to the customer's purchase. The Court finds this contention unavailing. First, this argument does not appear anywhere in Defendant's briefing and thus the Court need not consider it. Nevertheless, even

considering the argument on its merits, it still fails. The word "conditions" in the asterisk paragraph is not capitalized, as it is in the "Terms & Conditions" hyperlink—suggesting that the "conditions" to which it refers are the Park Rules, not the Terms hyperlink referenced at the bottom of the page. Further, it is far more reasonable for a user to assume that in clicking on a hyperlinked term, the hyperlink would take the user to the entirety of the applicable agreement that "it is mandatory to accept" in order to make her purchase, rather than requiring her to—in addition— exit those hyperlinked Park Rules terms, and navigate down to an entirely separate Terms hyperlink located in a set-off light-blue box at the bottom of the Website. *See* ECF No. 20-3 at 7.

Second, the Court must consider the clarity of the Website as a whole, by its structure and the positioning of the Terms relative to other integral parts of the purchase process. As the court in *Rodriguez* noted when analyzing the same Website, the Terms link "is visually separated from the portion of the webpage that displays the total purchase price of the tickets selected for purchase and the "Continue" button that must be clicked to move forward with a purchase," making it "unclear" whether the Terms govern the purchase of tickets. *Rodriguez*, 763 F. Supp. 3d at 354. The Court agrees with this analysis. Although the record here contains more pages from the purchase process than the *Rodriguez* court had before it, the fundamental layout of each page does not differ. On each page, the "Terms & Conditions" link is visually separated in its own box, separate from the button to continue to the next step of the purchase process, and from the vertical grey column to the right of each page which contains the price and fees information for the purchase.

Defendant attempts to distinguish *Rodriguez* by pointing out that the Court there did not have the benefit of the inclusion of all pages of the checkout process in the record. ECF No. 20-1 at 15–17. But the court in *Rodriguez* stated that "the presence of [identical] hyperlinks to the

Terms on four additional webpages involved in the ticket purchase process, as opposed to just one, would not change [the Court's] analysis." *Rodriguez*, 763 F. Supp. 3d at 352 n.16. This makes sense, as repeated presentations of Terms that are neither sufficiently conspicuous, nor sufficiently integrated with the rest of the purchase process, are no more persuasive or sufficient to provide notice than one presentation. Further, repeated presentation of the Terms here weighs *against* a finding of inquiry notice, rather than in favor of it, given the variations from page to page. For example, according to Defendant's images, the same Terms are presented on pages of the checkout process that include the option to upgrade the ticket purchased, the option to buy extra add-ons, on the page that links to "Park Rules" that must be accepted to purchase tickets, and on the final ticket confirmation page. ECF No. 20-3 at 4, 5, 7, 9. This leads to confusion—not clarity—as to whether the Terms govern ticket sales in general or ticket sales *and* upgrades *and* extras *and* ticket confirmation, and whether the Terms are even mandatory to purchase tickets, given the explicitly mandatory nature of the "Park Rules," enforced by the requirement to click the checkboxes before proceeding with the purchase.

Considering the totality of the circumstances, the Court finds that while the content of the Website is not cluttered, the lack of additional instruction or clarifying language concerning the Terms; and the layout of the Website, having the Terms visually separated from the purchase process, support a finding that Defendant has not carried its burden and demonstrated that Plaintiff was on inquiry notice as to the Terms. *See Soliman*, 999 F.3d at 842.[10]

---

[10] Defendant filed a notice of supplemental authority directing this Court's attention to *Dahdah v. Rocket Mortgage, LLC*, No. 24-1910, __ F.4th __, 2026 WL 194455 (6th Cir. Jan. 26, 2026), where the Sixth Circuit reversed a district court's holding that a website established inquiry notice and unambiguous manifestation of assent. First, the Court notes that this case is mere persuasive authority, and is not binding on the Court. Second, the Court notes that *Dahdah* dealt with a "hybrid" offer which "present the trickiest cases," as opposed to the browsewrap agreement at issue here. *Id.* at *5. Finally, one of the pages of the purchase process in *Dahdah* had language stating that: "By clicking the button above, you agree . . . to the LMB Terms of Use," which was hyperlinked and took the user to the arbitration agreement at issue. For these reasons, *Dahdah* is inapposite.

## 2.  Unambiguous Manifestation of Assent

Defendant also has not carried its burden to establish that Plaintiff unambiguously manifested assent to the Terms through her purchase of a ticket.

Unambiguous manifestation of assent to a contract's terms "can be accomplished by words or silence, action or inaction, so long as the user intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Nicosia*, 834 F.3d at 232 (quotation marks and citations omitted).  In the case of a browsewrap agreement, "there must be evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound." *Edmundson*, 85 F.4th at 704.  But "an internet user need not actually read the terms and conditions or click on a hyperlink that makes them available as long as she has notice of their existence." *Nicosia*, 834 F.3d at 232.

To determine whether an offeree knew or should have known of the terms of a web-based contract such that they unambiguously manifested assent, courts consider the following three factors:  (1) "whether the interface clearly warned the user that taking a specific action would constitute assent to certain terms"; (2) "whether notice of the contractual terms was presented to the consumer in a location on the interface and at time when the consumer would expect to receive such terms"; and (3) the "course of dealing between the parties, including whether the contract terms were conspicuously presented to the consumer at each use of the offeror's service and the consumer's conduct in response to the repeated presentation of conspicuous terms." *Edmundson*, 85 F.4th at 704–05 (citations and quotation marks omitted).

Applying these criteria to the present case, the Court concludes that Plaintiff did not unambiguously manifest her intent to be bound by the agreement to arbitrate disputes.

First, the interface here did not clearly warn customers that clicking the "Continue" button and proceeding through the purchase process would constitute acceptance of the Terms. Unlike with the "Park Rules," which had to be checked before the purchase could be completed, the Terms hyperlink does not contain any indication that clicking continue or completing the purchase would bind Plaintiff to the Terms as part of her purchase. Further, unlike in *Edmundson*, there is no message indicating that "selecting 'Confirm and continue' . . . constitutes [a customer's] confirmation that they 'agree to the <u>payment terms</u>'" that were hyperlinked. 85 F.4th at 707. While it is true that a company need not explicitly advise the user that the act of clicking a button will constitute assent to terms, the interface must still "'make clear' to the reasonable internet user that a specific 'click' signifies assent." *Id.* at 708. Here, the Court cannot find any such indication in the screenshots of the Website. Thus, the first factor weighs against an unambiguous manifestation of assent.

Defendant fares no better under the second factor. While the Terms appear "at time when the consumer would expect to receive such terms" throughout the purchase process, they are not in a location a customer would expect. *Edmundson*, 85 F.4th at 704–05 (citation omitted). The Terms are located on their own box at the bottom of the screen, separate from the continue button and separate from any price information for the items a customer is looking to purchase. This location—a distinct box that is above and to the left of the continue button and the price information, rather than "directly above" the continue button—weighs against finding that the Terms were incorporated into the purchase. *Edmundson*, 85 F.4th at 707.

Finally, the parties' course of dealing is short, and Defendant has not alleged a prior repeat relationship with Plaintiff. *See Edmundson*, 85 F.4th at 705 (discussing *prior* course of dealing between the parties, not future dealings). While Plaintiff alleges that she purchased a "2024 Gold

Season Pass," indicating an intent to return to Lake Compounce multiple times, there is no indication in the record that Plaintiff had interacted with Defendant's Website or was otherwise aware of the Terms *prior* to the purchase alleged in the complaint. ECF No. 1 ¶ 8.

Thus, the Court concludes that Defendant has not established that Plaintiff unambiguously manifested assent to the Terms, including their requirement to arbitrate any disputes or their prohibition on bringing a class action.

## IV.    CONCLUSION

For the reasons described herein, Defendant's motion to dismiss and to compel arbitration, ECF No. 20, is DENIED. Defendant's motion to supplement the record, ECF No. 47, is also DENIED. The parties' Rule 26(f) report is due by April 10, 2026. Defendant shall file its answer to the Complaint by March 27, 2026.

**SO ORDERED** at Hartford, Connecticut, this 6th day of March, 2026.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE